KHAI LEQUANG (SBN 202922)
klequang@orrick.com
RICHARD W. KREBS (SBN 278701)
rkrebs@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA  92614-8255
Telephone:   +1 949 567 6700
Facsimile:   +1 949 567 6710

Attorneys for Plaintiffs
BRIGHTON TRUSTEES, LLC, on behalf of and
as trustee for COOK STREET MASTER
TRUST and DIAMOND LS TRUST; and BANK
OF UTAH, solely as securities intermediary for
COOK STREET MASTER TRUST and
DIAMOND LS TRUST

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIGHTON TRUSTEES, LLC, on behalf of and as trustee for COOK STREET MASTER TRUST and DIAMOND LS TRUST; and BANK OF UTAH, solely as securities intermediary for COOK STREET MASTER TRUST and DIAMOND LS TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 2:19-cv-04210-CAS-GJSx<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT;**<br><br>**2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CONTRACTUAL);**<br><br>**3. CONVERSION; AND**<br><br>**4. DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiffs Brighton Trustees, LLC, on behalf of and as trustee for Cook Street

2   Master Trust and Diamond LS Trust; and Bank of Utah, solely as securities

3   intermediary for Cook Street Master Trust and Diamond LS Trust (collectively,

4   "Plaintiffs")[1], by and through their attorneys, file this Third Amended Complaint

5   against Defendant Transamerica Life Insurance Company ("Transamerica" or

6   "Defendant"), and allege as follows:

7                          **JURISDICTION AND VENUE**

8        1.    This Court has subject matter jurisdiction under 28 U.S.C.

9   § 1332(a)(2) and (3) because (a) there is complete diversity of citizenship—

10  Defendant is a citizen of Iowa and none of the Plaintiffs are citizens of Iowa; and

11  (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

12       2.    This Court has personal jurisdiction over Transamerica because

13  Transamerica regularly conducts and transacts business in this State, including

14  having issued many of the life insurance policies at issue out of and within this

15  state.

16       3.    Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and

17  1391(b) because Transamerica conducts business in the Central District of

18  California; a substantial part of the events giving rise to the claims occurred in this

19  judicial district, including Transamerica's issuance of many of the policies that are

20  at issue in this Complaint; and related actions have been brought and/or are pending

21  in this District.

22  _____

23  [1] At all times relevant to this case, Bank of Utah, has acted, and continues to act,
    solely in its capacity as a securities intermediary for the relevant entity or entities
24  provided herein and not in its individual capacity.  The Uniform Commercial Code
    defines a securities intermediary as "(i) a clearing corporation; or (ii) a person,
25  including a bank or broker, that in the ordinary course of its business maintains
26  securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14).

27

28

THIRD AMENDED COMPLAINT
                              CASE NO. 2:19-cv-04210-CAS-GJSx

## **NATURE OF THE ACTION**

4.     Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on Transamerica's unlawful increasing of the Monthly Deduction Rates ("MDR" or "MDRs") on certain of its in-force universal life insurance policies (the "Policies").  By raising the Monthly Deduction Rates on the Policies, in some cases by as much as 100%, without a proper basis, Transamerica has breached and continues to breach the express and implied terms of the Policies.

5.     The Policies are universal life insurance policies.  Broadly speaking, life insurance falls into one of two generic categories: (a) term life insurance and (b) cash value life insurance.

6.     Term life insurance provides protection for a limited number of years. The insurer pays the death benefit to the policyholder if the insured dies during the stipulated term (such as 10 or 20 years).  If the insured survives the term (*i.e.*, the term expires and the insured is still alive), or if premiums are not paid, the policy expires with no value.

7.     "Cash value" life insurance combines the term insurance component with a savings or "cash value" component.  Unlike term insurance, cash value life insurance can remain in force for the insured's entire life so long as the policyholder maintains a positive account value.  Premiums paid to fund cash value life insurance policies accumulate value over time.  The insurer earns interest on the accumulated value and credits a portion of that interest to the policyholder's account.  The insurer uses the accumulated value to fund the death benefit once the policy matures.  Whether the insured dies when the policy has a high or low accumulated value, the insurance company pays the same death benefit, equal to the face value of the policy, because the accumulated value is part of the death benefit.

8.     Universal life insurance is a form of cash value life insurance also known as "flexible premium" adjustable life insurance.  Like other cash value

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

policies, universal life insurance includes (a) the "mortality" component, for which the insurance company charges a cost to cover the risk of the insured's death (the "cost of insurance"); and (b) a "cash value" component, where premiums paid in excess of the cost of insurance (and certain other policy charges) accumulate (referred to as the "Accumulation Value" in the Policies) and earn interest at a rate that will not be lower than a "guaranteed minimum interest rate" (generally referred to in the life insurance industry as the "guaranteed minimum crediting rate" because the interest is "credited" to the policyholder's account).  The Accumulation Value is used to fund the policy charges, including the cost of insurance charges, and it makes up part of the death benefit.  In other words, the Accumulation Value is part of the coverage of the life insurance policy.  When the insurer pays out the death benefit, it makes no distinction between the Accumulation Value and the remaining portion of the death benefit—referred to as the Net Amount at Risk.  Indeed, some insurance companies design some universal life insurance policies to be funded in a way that the Accumulation Value equals the death benefit at age 100.

9.     Transamerica holds the Accumulation Value for Plaintiffs subject to the terms of the Policies, which prescribe how the Accumulation Value may be used.  Policyholders may access the Accumulation Value through procedures referred to as withdrawals or partial surrenders.  The Accumulation Value may be substantially withdrawn with no penalty if the policyholder has held the policy for longer than a certain number of years, called the "Surrender Penalty Period."  Even if the Surrender Penalty Period has not passed, however, a policyholder may access the Accumulation Value subject to a contractually-defined penalty, which is often minimal.  The surrender penalty decreases every year until the policy passes the Surrender Penalty Period.

10.     Universal life insurance is designed to give each policyholder flexibility, particularly with respect to the payment of premiums.  This can be demonstrated by comparing universal life insurance to another type of "cash value"

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

life insurance—whole life insurance.  With whole life insurance, a policyholder pays equal fixed premium payments for the life of a policy.  These fixed premium payments include an amount associated with the cost of the mortality risk (*i.e.*, the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to accumulate a "cash value" that earns interest over time, like the Accumulation Value in a universal life insurance policy.  In the insured's earlier years, the fixed premium payments of a whole life policy are typically far higher than the actual cost of the insured's risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the cost of insurance charges in the later years of the insured's life, when the fixed premium payments are likely to be lower than the actual cost of the insured's risk of death. That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

11.    Universal life insurance "unbundles" these components of a whole life insurance policy (a) so that the funding of the policy is transparent to the policyholder, who can see how the insurance company applies her or his premium payments and what the company deducts for policy charges and credits as interest to the policy account; and (b) to allow the policyholder to decide how much premium to pay, including choosing whether to pay just enough premium to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, is used to fund the death benefit and can also be used to pay for the cost of insurance in the future).  Notably, interest earned on the Accumulation Value is tax-deferred because the Accumulation Value is considered part of the insurance.

12.    Although there is no fixed premium payment that is due under a universal life insurance policy, if the balance in the policy account is insufficient to cover the policy's monthly charges, which include the cost of the insurance and

- 4 -

certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

13.     Universal life insurance policies have both guaranteed and non-guaranteed elements.  Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued.  Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy.  An example of a guaranteed element is the guaranteed minimum interest (or crediting) rate.  An example of a non-guaranteed element is the Monthly Deduction Rate, which is the rate that Transamerica charges to bear the risk of the insured's death and having to pay the death benefit.  (Many universal life insurance policies refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges for the mortality risk.)

14.     Although the Policies permit Transamerica to adjust the Monthly Deduction Rates (by increasing or decreasing them), the Policies limit Transamerica's ability to do so in at least two important respects.  First, any change in the Monthly Deduction Rates must be based on changes to Transamerica's expectations as to future cost factors, such as mortality, expenses, interest, persistency, and applicable federal, state, and local taxes.  Second, any change in the Monthly Deduction Rates must be prospective only:  Transamerica cannot raise the Monthly Deduction Rates to recoup past losses or make up for prior shortfalls in expected revenue.  In no case can the Monthly Deduction Rate exceed the table of guaranteed maximum Monthly Deduction Rates in the policy form.

15.     All 20 of the Policies were subject to significant Monthly Deduction Rate increases in 2016, some as high as 100%.  While Transamerica provided written notice of the rate increases, it has never explained how it determined the Monthly Deduction Rate increases.

16.     Transamerica purported to justify similar increases on similar policies by citing "current expectations regarding our future costs of providing this

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

coverage." Similarly, Transamerica told the press that its Monthly Deduction Rate increases were due to "expectations about future performance of certain universal life policies," claiming that its premiums were based on multiple factors, including "interest, mortality, taxes and expenses associated with the policy." *See* Ann Carns, *Rising Premiums for Universal Life Insurance Draw Scrutiny,* N.Y. TIMES, May 20, 2016, https://www.nytimes.com/2016/05/21/your-money/rising-premiums-for-universal-life-insurance-draw-scrutiny.html (last accessed January 1, 2019).

17. Over time, however, it became clear that these stated reasons by Transamerica were and are false.

18. For example, in December 2015 and July 2016, Plaintiffs' counsel, representing other Transamerica policyholders subject to the Monthly Deduction Rate increases, sent letters to Transamerica to request an explanation for the increase. Transamerica's responses were vague and misleading.

19. One letter response dated March 14, 2016, subsequently made public in connection with pending litigation, stated only that, at the time its universal life insurance policies were issued, the "general interest rate environment was significantly higher than that of today" and that the "original sales illustration provided at issue projected this policy's performance assuming no change in interest rate throughout the life of the policy." *See EFG Bank AG, et al. v. Transamerica Life Insurance Co.*, 16-cv-08104 (C.D. Cal.), Dkt. No. 88-1 at 123.

20. But these statements do not explain how a decline in the "general interest rate environment" over the past two decades justified a prospective increase in the Monthly Deduction Rate today, particularly because the policies, including the Plaintiff Policies, expressly prohibit Transamerica from changing Monthly Deduction Rates to recover past losses. Another letter response, dated August 4, 2016, was similarly opaque and merely repeated the language in the policies (including the Plaintiff Policies), stating that "[t]he factors considered include, but are not limited to, mortality, expenses, interest, and federal, state and local taxes."

*Id.* at 129.

21.     After additional requests from other policyholders to identify the specific cost factors relied upon to increase Monthly Deduction Rates, Transamerica finally identified mortality in a letter dated January 26, 2017: "Specifically, Transamerica's [sic] determined that future mortality experience is projected to be less favorable going forward on this block than anticipated at policy inception.  As expressly permitted by the policy, Transamerica increased the Monthly Deduction Rates as a result of this cost factor." *Id.* at 132.

22.     It is highly unlikely that Transamerica's expectations as to future mortality justify any rate increase at all, much less a rate increase of 100%.  That is because it is well-known in the life insurance industry that since Transamerica began issuing the Policies many years ago, mortality has ***improved***, not ***worsened***.  Indeed, in 2015, the same year Transamerica began raising the Monthly Deduction Rates on certain of its universal life policies and shortly before Transamerica raised the Monthly Deduction Rates on the Policies, the National Center for Health Statistics reported that mortality had improved by 16.6% between 2000 and 2014.[2] This improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a ***decrease***, not an increase, in the Monthly Deduction Rates.  Despite this fact, Transamerica has ***increased*** the Monthly Deduction Rates, and it has done so by as much as 100% for some Policies, in blatant breach of the Policies' express and implied terms and conditions.

23.     Similarly, as discussed in more detail herein, interest rates should have a relatively minor impact on Monthly Deduction Rates, and any negative impact they might have on Transamerica's cost of providing insurance should be offset by improved mortality.  Furthermore, in its letters citing the "general interest rate environment," Transamerica expressly referred to declining interest rates dating

[2] Sherry L. Murphy, et al., *Mortality in the United States, 2014*, NCHS Data Brief No. 229, 5 (Dec. 2015).

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

back to the "mid to late 1990's," which Transamerica emphasized fell below the minimum interest rate guaranteed to policyholders on their policy accounts.  Thus, Plaintiffs are informed and believe, and on that basis allege, that Transamerica has imposed its massive rate increases, and continues to impose them, in an unlawful and improper attempt to recover past losses or make up for prior shortfalls in revenue that Transamerica purportedly has experienced since the 1990s or early-2000s and pass on to policyholders the risk and costs associated with guaranteeing them a minimum interest rate, thereby rendering the guaranteed minimum interest rate illusory.

24.    Plaintiffs also are informed and believe, and on that basis allege, that Transamerica's massive rate increases improperly target investor policyholders that acquired their policies in or as a result of the secondary market.  Such policyholders, like Plaintiffs, have, as expressly allowed by their policies sometimes paid only enough premiums to cover their monthly policy charges, which has resulted in less premium revenue for Transamerica.  The Policies (including the Plaintiff Policies), however, do not permit Transamerica to raise Monthly Deduction Rates based on how policyholders choose to fund their policies. Indeed, the right to fund one's policy as one chooses is an expressly permitted right and benefit of the policies.

25.    Plaintiffs also are informed and believe, and on that basis allege, that when Transamerica originally marketed, illustrated, and sold the Policies, it failed to adequately disclose the risk of Monthly Deduction Rate increases and the potential impact of such increases.  By now drastically raising Monthly Deduction Rates by as much as 100%, it is apparent that Transamerica seeks to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies and forfeit the premiums they have paid to date, thereby depriving

policyholders of the benefits of their policies (what life insurance companies refer to as "shock lapses").

26.     Transamerica, in turn, will make a huge profit—either through the receipt of higher premium payments or by eliminating a large group of policies (through lapses or surrenders), not having to pay any death benefits thereon, and keeping the vast majority of the premiums paid on those policies to date.

27.     Transamerica's misconduct, as described more fully herein, constitutes not only express breaches of the Policies, but also breaches of the implied covenant of good faith and fair dealing.  Plaintiffs therefore seek compensatory damages, attorneys' fees, equitable relief, and attorneys' fees.

28.     Notably, in recent years, a handful of life insurance companies have increased cost of insurance rates despite the consistent improvements in U.S. mortality over the past several decades.  These rate increases have prompted numerous lawsuits, all of which, to Plaintiffs' knowledge, have resulted in the insurance companies paying out millions of dollars in settlements or verdicts. Indeed, Transamerica alone has paid over $100 million in settlements and judgments arising out of the same or similar MDR increases, but, upon information and belief, Transamerica still expects to receive far more in future premiums from its unlawful actions.

29.     Policyholders are not the only ones that have responded to the recent unlawful conduct of these life insurance companies.  In apparent response to complaints about a similar rate increase imposed by another life insurance company, the New York Department of Financial Services ("NYDFS") in 2017 adopted a new regulation to protect policyholders "from unjustified life insurance premium increases."[3]  The regulation, which took effect on March 19, 2018, gives

_____

[3] *See* Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm.

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

NYDFS the opportunity to review potential rate increases by requiring life insurance companies to notify NYDFS "at least 120 days prior to an adverse change in non-guaranteed elements of an in-force life insurance policy."[4]  The regulation also requires insurers to notify consumers "at least 60 days prior to an adverse change in non-guaranteed elements of an in-force life insurance or annuity policy."[5] In addition, the regulation requires insurers to "establish board-approved criteria for determining non-guaranteed charges or benefits" and mandates examination of "anticipated experience factors at specified times and under specified conditions but no less frequently than required by law to determine if the factors are reasonable."[6] The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a class of policies."[7]  "Profit margin is not an experience factor."[8]

30.    In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS's then-Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[9]

31.    An article in *The Wall Street Journal* published the same day noted that although the regulation would apply only in New York, it "could be widely copied by other insurance departments."[10]  A little more than a year later, California

---

[4] *See* Press Release, NYDFS, *DFS Issues Final Regulation to Protect New Yorkers From Unjustified Life Insurance Premium Increases* (Sept. 19, 2017), http://www.dfs.ny.gov/about/press/pr1709191.htm.
[5] *Id.*
[6] Life Insurance & Annuity Non-Guaranteed Elements §48.2, 11 NYCRR 48 (effective Mar. 19, 2018), https://www.dfs.ny.gov/docs/insurance/r_finala/2017/rf210txt.pdf
[7] *Id.*
[8] *Id.*
[9] Press Release, NYDFS, *supra* note 3.
[10] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016),

enacted a law similar to the New York regulation aimed at protecting policyholders from unjustified cost of insurance increases.[11]  The new law took effect on April 1, 2019.  Cal. Ins. Code § 10113.7.  Texas, too, is taking action.  In April and May 2019, the Texas House of Representatives and Senate unanimously passed House Bill 207, which similarly seeks to protect policyholders from unlawful Cost of Insurance rate increases.[12]

32.     Regulators have not only taken aim at the insurance companies for improperly attempting to increase cost of insurance rates, they have condemned those companies for failing to adequately disclose to policyholders the risk of future cost of insurance rate increases.  In the words of the current acting NYDFS Superintendent, Linda Lacewell, "DFS takes consumer protection very seriously and will take all actions necessary to ensure that policyholders are not being misled by insurers and agents offering often complex products."[13]

## THE PARTIES

33.     Brighton Trustees, LLC, which brings this action on behalf of and as trustee for Cook Street Master Trust and Diamond LS Trust, is a Delaware limited liability company with its principal place of business in New York.  The sole

---

[11] Press Release, Cal. Dep't of Ins., *Commissioner-Sponsored Life Insurance Bill Signed By Governor to Protect California Consumers* (Sept. 19, 2018), http://www.insurance.ca.gov/0400-news/0100-press-releases/2018/release115-2018.cfm.

http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201.

[12] Joseph D'Allegro, *Texas House Passes Life Premium Change Disclosure Bill,* Texas Lawyer (Apr. 18, 2019), https://www.law.com/texaslawyer/2019/04/18/texas-house-passes-life-premium-change-disclosure-bill/; *Texas House Bill 207*, LegiScan, https://legiscan.com/TX/bill/HB207/2019 (last visited June 4, 2019).

[13] Press Release, NYDFS, *Acting DFS Superintendent Lacewell Issues Consumer Alert Regarding Universal Life Insurance Policies* (Feb. 21, 2019), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1902211.

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

members of Brighton Trustees, LLC are individuals who are United States citizens domiciled in New York and Canada.

34.     Cook Street Master Trust and Diamond LS Trust are New York common law trusts.  Cook Street Master Trust and Diamond LS Trust are the beneficial owners and entitlement holders of the Policies (which Bank of Utah holds as securities intermediary for Diamond LS Trust and Cook Street Master Trust).

35.     As stated above, the trustee to Cook Street Master Trust and Diamond LS Trust is Brighton Trustees, LLC.  The depositors of Cook Street Master Trust are BroadRiver II (Ireland) DAC (f/k/a BroadRiver II (Ireland) Limited) and Drake Street Trust, a New York common law trust whose trustee is Brighton Trustees, LLC and whose depositor is BroadRiver II (Ireland) DAC (f/k/a BroadRiver II (Ireland) Limited).  The depositors of Diamond LS Trust are BroadRiver II (Ireland) DAC (f/k/a BroadRiver II (Ireland) Limited) and Cook Street Master Trust.  BroadRiver II (Ireland) DAC (f/k/a BroadRiver II (Ireland) Limited) is a juridical person.

36.     Bank of Utah is a Utah corporation with its principal place of business in Utah.  Bank of Utah is securities intermediary to Diamond LS Trust and Cook Street Master Trust.  Bank of Utah maintains securities accounts for Diamond LS Trust and Cook Street Master Trust as securities intermediary pursuant to written agreements—specifically, a September 30, 2016 Custodial and Securities Account Control Agreement between Bank of Utah and Brighton Trustees, LLC, on behalf of and as trustee for Diamond LS Trust; and a January 1, 2015 Custodial and Trust Account Control Agreement between Bank of Utah and Brighton Trustees, LLC, on behalf of and as trustee for Cook Street Master Trust.  Under the foregoing agreements, each policy constitutes a "Subject Life Contingent Asset" that Bank of Utah, as securities intermediary, has credited to the "Client Securities Account." Diamond LS Trust and Cook Street Master Trust are the "beneficial owner[s]" and

"entitlement holder[s]" under their respective agreements with Bank of Utah, and, accordingly, are entitled to exercise the rights that comprise each financial asset in the Client Securities Account.  Bank of Utah, as securities intermediary for Diamond LS Trust and Cook Street Master Trust, is identified as the owner and beneficiary of the policies on Transamerica's records.

37.     Upon information and belief, Transamerica is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa, and Transamerica Life Insurance Company is authorized to do business in the State of California and regularly conducts business in the State of California, including within this judicial district.

## FACTUAL BACKGROUND

### A.     Plaintiffs Own Transamerica Universal Life Insurance Policies Subject to Transamerica's Rate Increases

38.     Diamond LS Trust is the beneficial owner and entitlement holder of 14 Transamerica policies that are subject to Transamerica's increase in Monthly Deduction Rates.  Diamond LS Trust is represented in this lawsuit by its trustee, Brighton Trustees, LLC.  These policies have a date of issue between 1984 and 2006 and range in face amount from $500,000 to $20 million, and are listed on the attached **Exhibit 1** (the "Diamond Policies").  The Diamond Policies were issued in the States of California, Florida, Utah, New Jersey, South Dakota, Texas, and Iowa. A sample Diamond Policy, redacted for privacy, is attached hereto as **Exhibit 2** ("Diamond Doe Policy").  As noted above, Bank of Utah is listed on Transamerica's records as the owner and beneficiary of the Diamond Policies, but solely as securities intermediary for Diamond LS Trust.  Diamond LS Trust, as the beneficial owner and entitlement holder, owns the financial interest in the Diamond Policies.  Diamond LS Trust acquired the Diamond Policies from Asset-Backed Securities (Cayman), L.P. pursuant to a Purchase and Sale Agreement effective October 21, 2016 ("Diamond PSA").  Pursuant to the Diamond PSA and its

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

accompanying Bill of Sale, Diamond LS Trust acquired all of Asset-Backed Securities (Cayman), L.P.'s "right, title and interest" to the Diamond Policies "and the other rights relating to" the Diamond Policies, which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates.

39.    Cook Street Master Trust is the beneficial owner and entitlement holder of 6 Transamerica policies that are subject to Transamerica's increase in Monthly Deduction Rates.  Cook Street Master Trust is represented in this lawsuit by its trustee, Brighton Trustees, LLC.  These policies have a date of issue between 1996 and 2005 and range in face amount from $293,000 to $12.5 million, and are listed on the attached **Exhibit 3** (the "Cook Street Policies").  The Cook Street Policies were issued in the States of California, Connecticut, Florida, Texas, and North Carolina.  A sample Cook Street Policy, redacted for privacy, is attached hereto as **Exhibit 4** ("Cook Street Doe Policy").  Cook Street Master Trust, as the beneficial owner and entitlement holder, owns the financial interest in the Cook Street Policies.  Cook Street Master Trust acquired Cook Street Policy No. 60077666 from Berkshire Settlements, Inc. pursuant to an Assignment Agreement effective October 13, 2016, pursuant to which Cook Street Master Trust acquired all of Berkshire Settlement, Inc.'s "right, title and interest in the Policy and all ancillary agreements and associated documentation," which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates.  Cook Street Master Trust acquired Cook Street Policy No. 60078806 from Life Equity, LLC pursuant to an Assignment Agreement effective April 26, 2017, pursuant to which Cook Street Master Trust acquired all of Life Equity, LLC's "right, title and interest in the Policy and all ancillary agreements and associated documentation," which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates.  Cook Street Master Trust acquired Cook Street Policy No. 60094737 from Abacus

Settlements, LLC pursuant to an Assignment Agreement effective January 12, 2018, pursuant to which Cook Street Master Trust acquired all of Abacus Settlements, LLC's "right, title and interest in the Policy and all ancillary agreements and associated documentation," which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates. Cook Street Master Trust acquired Cook Street Policy No. 60124938 from Financial Credit Investment II Limited pursuant to a Purchase and Sale Agreement dated July 17, 2015, pursuant to which Cook Street Master Trust acquired all of Financial Credit Investment II Limited's "right, title and interest in, to and under the Purchased Assets," which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates.  Cook Street Master Trust acquired Cook Street Policy No. 92528748 from Life Receivables Eurotrust pursuant to a Purchase and Sale Agreement dated September 28, 2017, pursuant to which Cook Street Master Trust acquired all of Life Receivables Eurotrust's "right, title and interest in, to and under the Policies, and certain assets relating thereto" which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates.  Cook Street Master Trust acquired Cook Street Policy No. 60085074 from Life Receivables Eurotrust pursuant to a Purchase and Sale Agreement dated September 28, 2017, pursuant to which Cook Street Master Trust acquired all of Life Receivables Eurotrust's "right, title and interest in, to and under the Policies, and certain assets relating thereto," which included all rights of recourse or recovery against Transamerica relating to its increase in Monthly Deduction Rates.

### B.   Plaintiffs Acquired Their Policies in the Secondary Market

40.   Diamond LS Trust and Cook Street Master Trust acquired their Policies through the secondary market (sometimes referred to generally as the "life settlement" market).  A "life settlement" refers to the sale of a life insurance policy to a third party for a value greater than the policy's cash surrender value, but less

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

than its death benefit.  The seller receives a cash payment, while the purchaser assumes all future premium payments and receives the death benefit upon the death of the insured.

41.    Life settlements are possible because life insurance policies, like other property, are freely assignable.  *See Grigsby v. Russell*, 222 U.S. 149, 155-56 (1911).  As Justice Oliver Wendell Holmes observed over a century ago, "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving.  So far as reasonable safety permits, it is desirable to give life policies the ordinary characteristics of property."  Consistent with *Grigsby*, many state laws, including California law, expressly provide that life insurance policies are transferable.  *E.g.,* Cal. Ins. Code § 10130 ("A life or disability policy may pass by transfer, will or succession to any person, whether or not the transferee has an insurable interest.").

42.    Before the existence of a robust secondary market for life insurance, consumers who owned a life insurance policy but no longer needed or wanted it (or could no longer afford it)—often a senior who had outlived her or his savings—had two economically inefficient options: (i) let the policy lapse and receive nothing in return for the termination of the policy; or (ii) surrender the policy back to the insurance company in exchange for a cash surrender value that was typically a nominal amount.  Lapsing or surrendering a policy almost always results in a loss to the consumer and a windfall for the insurance company, which keeps most, if not all, of the premiums paid to date and never has to pay any death benefits to the policyholder.

43.    The emergence of the secondary market for life insurance has addressed this market deficiency by providing consumers with a third, often superior option: they can sell (or "settle") their policies to someone other than the insurance company.  The buyer, often a bank, insurance company, or pension fund seeking investments uncorrelated to the traditional equity and debt capital markets

may offer the consumer as much as, or even more than, ten times the cash surrender value offered by the insurance company.  The buyer continues to pay premiums and will receive the death benefit when the policy matures.  This secondary market has benefited consumers, particularly older age policyholders who no longer wish to keep paying for life insurance, by providing a liquid market where they can sell their policies for fair value, as opposed to just lapsing or surrendering their policies to the insurance company that issued them and receiving nothing or very little in return (a big win for insurers but a big loss for consumers).

44.     Indeed, governmental agencies have recognized the benefits of the secondary market to consumers.  For example, in a July 2010 Report to the United States Senate Special Committee on Aging, the Government Accountability Office ("GAO Report") observed: "A policy owner with unneeded life insurance can surrender the policy to the insurer for its cash surrender value.  Or, the owner may receive more by selling the policy to a third-party investor through a life settlement."[14]  The United States Securities and Exchange Commission similarly observed that "[i]nsured individuals or policy owners sell their policies in the secondary market rather than allowing them to lapse or surrendering them to the insurance company for cash value to maximize their asset."[15]

45.     Insurance companies like Transamerica embraced the secondary market because it helped them sell more insurance.  Consumers who would not otherwise buy life insurance purchased insurance with the comfort they could later sell their policies for fair market value if they did not need or want to keep their policies.  Indeed, Transamerica itself in 2007 planned to enter the life settlement market, with then-President Ken Kilbane telling the company's agents "we believe

---

[14] United States Government Accountability Office, Report to the Special Committee on Aging, U.S. Senate, "Life Insurance Settlements: Regulatory Inconsistencies May Pose a Number of Challenges," GAO-10-775, July 2010.

[15] Life Settlements Task Force, Staff Report to the United States Securities and Exchange Commission, July 22, 2010.

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

this market will prove to be quite viable for you and Transamerica" while observing that "[t]here are millions of potential customers who are looking for a fair settlement for policies they no longer need."[16]

46.     But after reaping the benefits of hundreds of millions, if not billions, of dollars in premiums collected over the past two decades, particularly from older age insureds, Transamerica has targeted many of these policies for MDR increases.  Its purpose is clear: force policyholders, including investors that purchased their policies in the secondary market, either to pay exorbitant rates to keep their policies in force or lapse or surrender their policies, thereby destroying the economic benefit of the policies.  If companies like Transamerica are not deterred from executing such a strategy, they will cripple—if not ultimately destroy—the secondary market because secondary market purchasers will not want to incur the risks of such unlawful rate increases.

### C.     Transamerica Raises Monthly Deduction Rates

47.     As is typical of universal life insurance policies, the Plaintiff Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly policy charges (referred to in the Policies as the "Monthly Deduction").  As stated in the majority of the Policies, the Monthly Deduction, which includes the cost of insurance and certain other policy charges/fees, is equal to:

> (a)  the Monthly Deduction Rate, times .001, times the difference between the death benefit and the Accumulation Value of the certificate [or policy] (or of each Layer, respectively) at the beginning of the certificate [or policy] month;

plus   (b) the Monthly Deduction for any Riders;

plus   (c) the Certificate [or policy] Fee;

---

[16] Matt Brady, "Transamerica Has Plans To Enter The Life Settlement Market," LifeHealthPro, Aug. 19, 2007.

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

plus    (d) the monthly expense charge per thousand rate times .001, times the face amount of the certificate [or policy] (or of each Layer, respectively).

Diamond Doe Policy, Ex. 2 at 55; Cook Street Doe Policy, Ex. 4 at 92.

48.    Element (a) of the Monthly Deduction formula above is the cost of insurance, which is the largest and most significant charge.  As shown above, it is determined by multiplying the Monthly Deduction Rate (the cost of insurance rate) times .001 times the difference between the death benefit and the Accumulation Value of the Policy.  The rate is multiplied by .001 because the rate is per $1,000 of insurance.  Furthermore, the Accumulation Value is deducted from the death benefit because, although the Accumulation Value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on the Accumulation Value, which is the savings component of the Policies and not the "insurance."

49.    After deducting the Monthly Deduction from the Policy account, any balance that is left reflects the ending Policy Accumulation Value, which accrues interest at a rate that cannot be lower than the guaranteed minimum interest rate (4% for the Doe Policies).  Diamond Doe Policy, Ex. 2 at 53-54; Cook Street Doe Policy, Ex. 4 at 90-91.  If in any month there are insufficient funds in the account to cover the Monthly Deduction, the Policy will enter a grace period.  If additional premiums are not paid within the grace period, Transamerica will terminate, or lapse, the Policy.  The grace period depends on the individual Policy, but for the Doe Policies, it is either 61 days or 60 days.  *See* Diamond Doe Policy, Ex. 2 at 51-52; Cook Street Doe Policy, Ex. 4 at 88.

50.    The Monthly Deduction Rates under the Plaintiff Policies are based initially on certain characteristics of the insured, including her or his gender, age, and risk class.  As the insured ages, in accordance with the terms of the Policies, the Monthly Deduction Rates increase every year.

51.     Many of the Plaintiff Policies state that Transamerica "will determine the Monthly Deduction Rate for each certificate [or policy] month at the beginning of that certificate [or policy] month."  Diamond Doe Policy, Ex. 2 at 54; Cook Street Doe Policy, Ex. 4 at 91.  At least some of the Plaintiff Policies further provide:

> Any change in the Monthly Deduction Rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to:  mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

*See, e.g.*, Diamond Doe Policy, Ex. 2 at 55; Cook Street Doe Policy, Ex. 4 at 92.

52.     Many of the Plaintiff Policies further state that Transamerica "do[es] not distribute past surplus or recover past losses by changing the Monthly Deduction rates."  Diamond Doe Policy, Ex. 2 at 64; Cook Street Doe Policy, Ex. 4 at 99.

53.     Accordingly, among many other things, under the terms of the Plaintiff Policies, any change in the Monthly Deduction Rates (a) can only be based on Transamerica's expectations as to future cost factors; and (b) must be prospective only: Transamerica cannot change rates to recover past losses (or distribute past surplus).

54.     In or about June 2015, Transamerica began notifying policyholders that it was raising the Monthly Deduction Rates on certain of its in-force universal life insurance policies.  Sample letters for the Diamond Doe Policy and the Cook Street Doe Policy are attached hereto as **Exhibits 5 and 6**.  The letters disclose rate increases as high as 100%.  Some of the letters also represent that the rate increase applies equally to all policies of a particular policy type (*i.e.*, the rate increase is not limited to a subset of such policies).  *See, e.g.*, Ex. 5 at 112 ("We are increasing the monthly deduction rates for all TransUltra EX TULTRVEX policies[.]"); Ex. 6 at

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

114 ("We are increasing the monthly deduction rates for all Default TULTCXL1 policies[.]").  Although Transamerica stated generally that it was increasing the Monthly Deduction Rates "based on our current expectations regarding our future costs of providing [or to provide] this coverage," it did not say what cost factors it was relying upon in support of its rate increase.

55.    It is apparent that Transamerica's increase in the Monthly Deduction Rates breaches the terms of the Plaintiff Policies in at least three ways.

56.    **First**, the increase in Monthly Deduction Rates is not based on Transamerica's expectations as to future cost factors.

57.    **Second**, the rate increase appears to be an improper attempt to recover prior losses or shortfalls caused by declining interest rates beginning in the mid-1990s.

58.    **Third**, the rate increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract and every Policy.

**D.    The Increase in Monthly Deduction Rates Is Not Based on Expectations as to Future Cost Factors**

59.    The Doe Policies state that Transamerica may base a change in the Monthly Deduction Rates only on changes in its expectations as to future cost factors.  These cost factors include mortality, expenses, interest, persistency, and any applicable federal, state and local taxes.  To be "subject to" future cost factors, the magnitude of any change in Monthly Deduction Rates must correspond to any changes in future cost factors.

**Mortality**

60.    While mortality is the most significant factor in providing life insurance coverage, it is well known in the life insurance industry that over the past 20 to 30 years, mortality has improved, not worsened, and people are living much longer than anticipated several years ago when Transamerica priced the Policies. For example, in 2015, the National Center for Health Statistics reported

"[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that this year-to-year improvement was "consistent with long-term trends."[17] "Although year-to-year changes are usually relatively small," explained the National Center for Health Statistics, "the age-adjusted death rate in the United States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."[18]  This "long-term trend" of improving mortality is also evidenced by the release of several new mortality tables over the past two decades that would, if anything, support a *decrease* in the Monthly Deduction Rates, not an increase in rates as high as 100%.

61.    Specifically, in 2001, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("AAA") produced the 2001 Commissioner's Standard Ordinary ("CSO") Table, which replaced the previous 1980 CSO Table to reflect significant improving mortality.  Upon information and belief, the maximum Monthly Deduction Rates allowed under the Policies are based on the older 1980 CSO Table, not the newer 2001 CSO Table.  The SOA also is currently investigating an update of the 2001 CSO Table, and a 2015 investigative report by the SOA showed significant reductions in insurance company reserves compared to the 2001 CSO Table due to mortality improvements since 2001.  In 2008, the SOA also released a 2008 Valuation Basic Table ("VBT") that reflected significant mortality improvements compared to prior tables.  In 2014, the SOA released the 2014 VBT, which showed overall mortality improvement from the 2008 VBT.

62.    These new mortality tables demonstrate that since Transamerica originally priced the Policies (as early as the 1980s or 1990s), mortality has improved, not worsened, and this change in mortality would support a *decrease*, not increase, in the Monthly Deduction Rates.  Indeed, one life insurance company recently paid $90 million to settle claims that it *failed to lower* cost of insurance rates in light of the improvements in mortality.

---

[17] Murphy, *supra* note 2, at 5.
[18] *Id.*

63.     Transamerica's regulatory filings over the past several years also do not refer to or mention any adverse changes to mortality that would support its rate increase.  Each year, life insurance companies file with state insurance departments a Statement of Nonguaranteed Elements, which answers certain interrogatories about the nonguaranteed elements of their policies.  Interrogatory No. 4 asks whether Transamerica's "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience."  Transamerica's Statements of Nonguaranteed Elements from 2011 to 2015 are attached hereto as **Exhibit 7 to Exhibit 11**, respectively.  In the four years preceding Transamerica's initial rate increase in 2015, Transamerica never once stated that its anticipated mortality was worse than its current experience.  *See* Exs. 7-10 (Answers to Interrogatory No. 4).  It was not until December 31, 2015 that Transamerica suggested for the first time that it anticipated adverse mortality.  Even then, however, Transamerica did not identify mortality specifically, but stated only very generally that "[c]urrent mortality, persistency, investment, tax and expense levels are generally different from those anticipated in the pricing of some products."  Ex. 11 at 160 (Answer to Interrogatory No. 4).  This statement was made just months before Transamerica notified many policyholders that it was increasing the Monthly Deduction Rates on certain policies.  *See* Ex. 6 at 114 (December 12, 2016 Increase Notice Letter notifying of a 100% increase in the Monthly Deduction Rates).  It is implausible that in just one year, Transamerica went from anticipating no changes in mortality to anticipated mortality changes that it claims justify as much as a 100% increase in the Monthly Deduction Rates.

## Interest

64.     While "interest" is listed as a cost factor upon which Transamerica may base a change in the Monthly Deduction Rates, Plaintiffs are informed and believe, and on that basis allege, that Transamerica's rate increase is based on a decline in interest rates going back to the mid to late 1990s.  This historic decline in

interest rates cannot be the basis for a change in Monthly Deduction Rates because the Policies require that any change in the Monthly Deduction Rates be subject to Transamerica's expectations as to "future" cost factors, and they prohibit Transamerica from changing the Monthly Deduction Rates to recover past losses. *See infra* section F.

65.    Moreover, even if lower interest rates may impact Transamerica's cost of providing insurance, they would not justify an increase in Monthly Deduction Rates as high as 100% because interest rates should be a relatively minor factor in calculating Transamerica's cost of insurance (and, consequently, its Monthly Deduction Rates).

66.    To begin with, as it relates to Monthly Deduction Rates, "interest" (one of the cost factors Transamerica may consider) can only refer to the interest that Transamerica earns (or expects to earn) on its profits from providing insurance, and not on funds in its policyholders' accounts.  As explained above, universal life insurance policies, like the Policies, consist of two distinct components – (a) the life insurance, or "mortality," component; and (b) the Accumulation Value, or "savings," component.  Transamerica earns interest on both of these components.

67.    However, although a life insurance company may earn interest on both the mortality component and the savings component, it can only consider interest it earns on the mortality component when determining the ***cost of insurance***; the interest it earns from investing funds in policyholder accounts is only relevant to setting the interest rate credited to those accounts.  This is because the cost of insurance is the mortality charge.  It is intended to cover the risk of the insured's death, not the interest rate risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

68.    The cost of insurance charge includes an expected profit over the insurance company's expected mortality.  The insurance company then expects to invest this profit and earn interest on it.  The company then factors this profit and

the interest on this profit in setting the cost of insurance rates (or, here, the Monthly Deduction Rates).  Lower interest rates may result in lower interest income, but lower interest rates would not result in a loss unless the insurance company's investments had a negative return.  But this is highly unlikely to occur because most life insurance companies invest primarily in investment grade fixed-income securities, such as bonds.  Thus, to the extent Transamerica is raising the Monthly Deduction Rates because it is earning less interest on its mortality profits, it is highly unlikely that this lower interest income would justify an increase in Monthly Deduction Rates, much less one as high as 100%.

69.    To illustrate this, assume Transamerica's cost of insurance contemplated a 20% mortality profit.  For every $120 in cost of insurance charges received in a year, Transamerica would expect to pay out $100 in claims, leaving $20 in mortality profits to invest.  If it assumed it would earn 5% interest on the profit of $20 in that year, it would expect to earn $1.00 of interest.  If it now expects to earn 1% instead of 5%, the interest would drop to $0.20 instead of $1.00.  But this 80% drop in interest income would not translate to an 80% increase in Monthly Deduction Rates because it does not capture the $20 mortality profit.  In other words, Transamerica is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected.  If Transamerica experienced favorable mortality (paying out less in death benefits, and receiving more in premiums), that favorable mortality experience should also offset the cost associated with the lower than expected interest.  Although this is a very rudimentary example, it illustrates how a decline in interest is not likely to result in a rate increase as high as 100%.

70.    As to the interest earned on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts.  That is, if the life insurance company is earning 8% interest on funds held in policyholder accounts, it may

credit such accounts with 7% and earn a spread of 1%.  If interest rates are low and the life insurance company is earning only 5% interest, it may lower the crediting rate to 4% and still earn a 1% spread.  Thus, even if Transamerica could consider the interest it earns from investing funds in policyholders' accounts (which it cannot), this would not justify an increase in Monthly Deduction Rates, but only a change in the interest rate credited to policyholder accounts.

71.     However, if Transamerica expects to earn only 3% interest from investing funds held in policyholders' accounts, Transamerica cannot reduce the crediting rate to 2% because this rate would be below the 4% guaranteed minimum interest rate credited to policyholders.  Nor, however, can Transamerica attempt to offset this loss by raising the Monthly Deduction Rates.  If it could, the cost of insurance (which is calculated by using Monthly Deduction Rates) would not be a mortality charge, but a way for Transamerica to guarantee its profitability on the policies by transferring to policyholders all of the interest rate risk under the policies, including the interest rate risk on policy Accumulation Values and the risk of interest rates falling below the guaranteed minimum interest rate.  This would render the guaranteed minimum interest rate meaningless.

72.     Furthermore, even if Transamerica is properly considering only interest on its mortality profits, to the extent Transamerica is raising Monthly Deduction Rates to achieve its original profit expectations, the rate increase is improper because Transamerica cannot raise Monthly Deduction Rates simply to guarantee itself its original profit expectations.  As NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.[19]

73.     In light of this, and given the magnitude of Transamerica's rate increases, Plaintiffs are informed and believe, and on that basis allege, that

_____

[19] Press Release, NYDFS, *supra* note 3.

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

Transamerica has imposed the MDR increases not because its mortality and interest rate experience have been unfavorable enough to require an increase in MDRs, but rather to boost its profits. Profit is not a factor that Transamerica can consider in changing Monthly Deduction Rates. Furthermore, using Monthly Deduction Rates to guarantee Transamerica's original profitability assumptions, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

74.     Plaintiffs are informed and believe, and on that basis also allege, that Transamerica's massive rate increases also improperly target investor policyholders that acquired their policies in or as a result of the secondary market. Plaintiffs are informed and believe, and on that basis allege, that Transamerica deliberately decided to raise MDRs on policy products that were predominantly owned by investors, and not raise them on other policy products. Investor policyholders, like Plaintiffs, have, as expressly allowed by the policies, generally paid only enough premiums to cover their monthly policy charges, which has resulted in less premium revenue for Transamerica. The Policies, however, do not permit Transamerica to raise Monthly Deduction Rates based on how much policyholders choose to fund their policies. Indeed, the right to fund one's policy as one chooses is one of the expressly permitted benefits of the Policies.

75.     In sum, by drastically raising Monthly Deduction Rates on the Plaintiff Policies, Transamerica seeks to force Plaintiffs either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid over the last decades. Transamerica, in turn, will make a huge profit – either through billing and collecting higher premium payments or by eliminating a large group of policies (through lapses or surrenders), keeping the premiums that have been paid to date to Transamerica, and avoiding the risk of having to pay any death benefit. As the NYDFS Superintendent stated in regards to NYDFS's

proposed regulation to address this very issue:  Life insurers do not have "free reign to implement unjustified cost of insurance increases . . . simply to boost profits."

**E.    The Increase in Monthly Deduction Rates Is an Impermissible Attempt to Circumvent the Guaranteed Minimum Interest Rate**

76.    Under the express and implied terms of the Plaintiff Policies, a policyholder has the right to pay enough premiums only to cover the Monthly Deduction.  If the policyholder contributes more than needed to cover the Monthly Deduction, leaving a balance remaining in the policy account, the Plaintiff Policies provide that the balance will accrue interest at a rate no lower than the guaranteed minimum interest rate.  Diamond Doe Policy, Ex. 2 at 54; Cook Street Doe Policy, Ex. 4 at 91.  The guaranteed minimum interest rate provided for under at least most of the Plaintiff Policies is 4%.

77.    In responses provided to counsel representing other affected policyholders, Transamerica suggested that low interest rates were at least one reason for Transamerica's increase in the Monthly Deduction Rates.  To the extent Transamerica considered the interest it earns on funds in policyholder accounts, the rate increase also violates the Plaintiff Policies' guaranteed minimum interest rate provision.  This is evident because if the interest Transamerica earned on funds in policyholder accounts did not drop near or below the guaranteed minimum interest rate it is required to credit to policyholders, Transamerica could simply address the change in interest rates by lowering the interest rate credited to policyholders.  But if Transamerica is raising Monthly Deduction Rates instead of lowering the interest rate credited to policyholders, this presumably is because lowering the interest rate credited to policyholders would not be sufficient for Transamerica – because it is earning interest near or below the guaranteed minimum interest rate (thus, reducing its originally anticipated spread).  By raising Monthly Deduction Rates to account for this, however, Transamerica is trying to do indirectly what it cannot do directly: it is using Monthly Deduction Rates to achieve an interest crediting rate that is

lower than the guaranteed minimum interest crediting rate, which violates the Plaintiff Policies.  And it is doing so when Transamerica has at all times been very profitable, paying massive dividends to its Dutch parent, AEGON NV ("AEGON").

78.     In short, Transamerica is trying to take the "guarantee" out of the guaranteed minimum interest rate.  By depriving policyholders of the right to the guaranteed minimum interest rate, Transamerica has breached not just the express terms of the Plaintiff Policies, but also the implied covenant of good faith and fair dealing.

### F.     Attempting to Recoup Prior Losses

79.     The majority of the Plaintiff Policies also state either directly, or using similar language, that Transamerica "do[es] not distribute past surplus or recover past losses by changing the Monthly Deduction Rates."  Diamond Doe Policy, Ex. 2 at 64; Cook Street Doe Policy, Ex. 4 at 99.

80.     Among other things, not only are Transamerica's increases in Monthly Deduction Rates not based on changes in future cost factors, but by basing the rate increase on interest rates that have existed since the mid to late 1990s, the rate increase also is intended to recover past losses or profit shortfalls since that time. The rate increase therefore violates the requirement under the Plaintiff Policies that any rate increase be prospective and the prohibition that Transamerica not change the Monthly Deduction Rates to recover past losses.

81.     Plaintiffs are informed and believe, and on that basis allege, that it is more likely that Transamerica improperly imposed such large Monthly Deduction Rate increases to recoup self-inflicted harm created by Transamerica's payment of massive dividends to its Dutch parent, AEGON.  In 2010-2014 alone, Transamerica paid dividends totaling over $2 billion that benefited its ultimate Dutch parent company, AEGON.

## COUNT I

### (Breach of Contract – Express)

### (All Policies)

82.     Plaintiffs reallege the allegations contained in paragraphs 1 through 81, inclusive, as if set forth fully herein.

83.     The Plaintiff Policies are binding and enforceable contracts.

84.     Transamerica materially breached each of the Plaintiff Policies in several respects, including but not limited to the following:

a.     By increasing the Monthly Deduction Rates on a basis other than changes to Transamerica's expectations as to future cost factors;

b.     By increasing the Monthly Deduction Rates in an attempt to recover past losses or make up for prior shortfalls in expected revenue; and

c.     By imposing excessive cost of insurance rates, including by failing to lower cost of insurance rates.

85.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Transamerica's conduct as alleged herein.

86.     As a direct and proximate cause of Transamerica's material breaches of the Plaintiff Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT II

### (Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)

### (Policies issued in CA, CT, FL, IA, NJ, NC, and SD)

87.     Plaintiffs reallege the allegations contained in paragraphs 1 through 86, inclusive, as if set forth fully herein.

88.     The Plaintiff Policies are binding and enforceable contracts.

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

89.    The Plaintiff Policies include an implied covenant, actionable in contract, that Transamerica will act in good faith and deal fairly with Plaintiffs.

90.    Transamerica materially breached the Plaintiff Policies' implied covenant in several respects, including but not limited to the following:

a.    By charging excessive Monthly Deduction Rates, thereby denying Plaintiffs the benefit of their actual policy Accumulation Values;

b.    By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising the Monthly Deduction Rates;

c.    By increasing the Monthly Deduction Rates in an attempt to achieve Transamerica's original expected profitability for the Policies at policyholders' expense;

d.    By improperly targeting its rate increases at policyholders, including Plaintiffs, who have chosen to exercise their right to fund their policies as they choose;

e.    By increasing the Monthly Deduction Rates to circumvent the guaranteed minimum interest rate under each of the Plaintiff Policies;

f.    By attempting to force Plaintiffs and other policyholders either to (i) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (ii) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date;

g.    By failing to lower cost of insurance rates; and/or

h.    By failing to provide meaningful disclosures about the increase in Monthly Deduction Rates.

91.    Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Transamerica's conduct as alleged herein.

92.     Transamerica's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

93.     As a direct and proximate cause of Transamerica's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT III

### (Conversion)

### (All Policies)

94.     Plaintiffs reallege the allegations contained in paragraphs 1 through 93, inclusive, as if set forth fully herein.

95.     Plaintiffs had a property interest in the funds Transamerica deducted from their Accumulation Values in excess of the amounts permitted by the terms of the Policies due to Transamerica's wrongful increases in Monthly Deduction Rates.

96.     Plaintiffs had the right to immediately possess the funds from their Accumulation Values through a variety of contractual measures, including Surrender Penalty Free Withdrawals.  The specific amount capable of immediate withdrawal is determinable by a specific calculation included in each policy contract.  *See* Ex. 2 at 58-60.

97.     Transamerica intentionally and substantially interfered with that property interest.  By increasing Monthly Deduction Rates and making Monthly Deductions in unauthorized amounts from the Accumulation Values of Plaintiffs' Policies, Transamerica assumed and exercised ownership over, and misappropriated or misapplied, specific funds placed in the custody of Transamerica for the benefit of Plaintiffs, without authorization or consent and in hostility to the rights of Plaintiffs.

98.    Transamerica continues to retain these funds unlawfully.  At no time did Plaintiffs consent to such wrongful deduction and retention of funds by Transamerica.

99.    Transamerica's wrongful exercise of control over the personal property of Plaintiffs constitutes conversion.

100.   Transamerica intended to cause damage to the Plaintiffs by increasing Monthly Deduction Rates and deducting more from Plaintiffs' Policies' Accumulation Values than was authorized by the Policies.

101.   As a direct and proximate result of Transamerica's conduct, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, Transamerica's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT IV

### (Declaratory Relief)

### (All Policies)

102.   Plaintiffs reallege the allegations contained in paragraphs 1 through 101, inclusive, as if set forth fully herein.

103.   For reasons including but not limited to those stated herein, there exists an actual dispute and controversy between Plaintiffs and Transamerica concerning Plaintiffs' rights and Transamerica's obligations under the Plaintiff Policies, including but not limited to how Transamerica must implement any change in the Monthly Deduction Rates and under what circumstances Transamerica may change the Monthly Deduction Rates.

104.   Accordingly, Plaintiffs seek a declaration (i) that Transamerica's increase in the Monthly Deduction Rates is improper under the Plaintiff Policies and that any excess premiums received must be returned; and (ii) setting forth the

specific guidelines that govern the factual circumstances under which Transamerica can raise the Monthly Deduction Rates.

105.   Such a declaration will help prevent or limit any future controversies under the Plaintiff Policies by providing guidance as to when and how Transamerica can change the Monthly Deduction Rates on its in-force Policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### On the First Count

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other further and different relief as the Court may deem proper to grant to Plaintiffs.

### On the Second Count

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other further and different relief as the Court may deem proper to grant to Plaintiffs.

### On the Third Count

1.     For compensatory damages in an amount to be determined at trial;

2.     For punitive damages in an amount to be determined at trial;

3.     For an award of pre-judgment and post-judgment interest;

4.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other further and different relief as the Court may deem proper to grant to Plaintiffs.

### On the Fourth Count

1.      For a declaration (i) that Transamerica's increase in the Monthly Deduction Rates is improper under the Plaintiff Policies and that any excess premiums received must be returned; and (ii) setting forth the specific guidelines that govern the factual circumstances under which Transamerica can raise the Monthly Deduction Rates;

2.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.      For such other further and different relief as the Court may deem proper to grant to Plaintiffs.


Dated:      December 4, 2019                 ORRICK, HERRINGTON &
                                             SUTCLIFFE LLP


                                             By:_____/s/ Khai LeQuang_____
                                                      KHAI LEQUANG

                                             Attorney for Plaintiffs
                                             BRIGHTON TRUSTEES, LLC on behalf
                                             of and as trustee for COOK STREET
                                             MASTER TRUST and DIAMOND LS
                                             TRUST; and BANK OF UTAH, solely as
                                             securities intermediary for COOK
                                             STREET MASTER TRUST and
                                             DIAMOND LS TRUST

THIRD AMENDED COMPLAINT
CASE NO. 2:19-cv-04210-CAS-GJSx

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:          December 4, 2019                    ORRICK, HERRINGTON &
                                                     SUTCLIFFE LLP


                                                     By:      */s/ Khai LeQuang*
                                                              KHAI LEQUANG

                                                     Attorney for Plaintiffs
                                                     BRIGHTON TRUSTEES, LLC on behalf
                                                     of and as trustee for COOK STREET
                                                     MASTER TRUST and DIAMOND LS
                                                     TRUST; and BANK OF UTAH, solely as
                                                     securities intermediary for COOK
                                                     STREET MASTER TRUST and
                                                     DIAMOND LS TRUST